# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-09-00093-CR

**Stuart Carter, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT NO. 2007-455, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Stuart Carter of the misdemeanor offense of deadly conduct. *See* Tex. Penal Code Ann. § 22.05(a) (West 2003). Punishment was assessed at 365 days in the Caldwell County jail and a $1,500 fine, but the district court suspended imposition of the sentence and placed Carter on community supervision for one year. In two points of error, Carter contests the legal and factual sufficiency of the evidence. We will affirm the judgment.

### BACKGROUND

We will review the evidence in detail when discussing Carter's points of errors. Briefly, the jury heard evidence that on June 11, 2007, Carter pointed his rifle at the alleged victim, William Bryant. Bryant testified that he and his wife own an oil production company located in Caldwell County and operate wells on land leased from Carter. According to Bryant, the lease gives him the right to enter Carter's property and check on his oil wells, which he does on a daily basis.

On the day in question, Bryant recalled, he drove out to Carter's property accompanied by his two dogs, who were riding in the bed of Bryant's pickup truck. Bryant described both of his dogs as "mutts" but testified that one of them may have been "part Chow" while another "had the markings of a Rottweiler." When Bryant arrived at the property, his dogs jumped out of the truck and began running alongside it. After Bryant finished checking the wells, he got back in his truck and began to leave the property; his dogs remained outside the truck, "running in front" of the truck.

Before Bryant had exited the property, he observed Carter's pickup truck approaching from the opposite direction and come to a stop. Bryant testified that Carter exited the vehicle and pulled out what appeared to be a .22-caliber rifle. According to Bryant, as his dogs began to run toward Carter, Carter began to fire his weapon at the dogs, hitting both of them. One of the dogs ran away, but the other dog, the one that may have been part Rottweiler, continued toward Carter, attempted to climb into the bed of Carter's truck, where Carter's dog was, and apparently began to attack Carter's dog. Bryant testified that he then got out of his truck, told Carter, "Hold up, hold up, I'll get them," and approached Carter's truck. Carter, however, continued firing shots at Bryant's dog. Bryant testified that when he was approximately 30 to 40 yards away from Carter, Carter turned toward him, pointed the gun at Bryant's chest, and yelled, "Why did you bring those dogs by here? I told you not to bring them." Bryant then slowly retreated back to his truck, drove it adjacent to Carter's truck, got out of the vehicle, and told Carter that shooting the dogs had been unnecessary. Carter, who had returned his rifle to his truck, told Bryant to call 911, and Bryant eventually did so. Bryant then retrieved his dogs, one of which was already dead, and drove away. His other dog died while Bryant was en route to the veterinarian's office. Bryant then picked up his wife, returned

2

to Carter's property, and waited for the authorities to arrive. Upon arrival, police officers took statements from both Carter and Bryant.

Carter was subsequently charged with the offense of aggravated assault with a deadly weapon. The case proceeded to trial. The jury acquitted Carter of the aggravated-assault charge, but convicted him of the lesser-included offense of deadly conduct. This appeal followed.

## STANDARD OF REVIEW

In a legal sufficiency review, we consider whether, after viewing the evidence in the light most favorable to the finding of guilt, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "This standard accounts for the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Clayton*, 235 S.W.3d at 778 (quoting *Jackson*, 443 U.S. at 319). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). A finding of guilt should be set aside only if the evidence supporting the finding is so weak as to render the finding clearly wrong or manifestly unjust. *See id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008,

3

pet. ref'd). Therefore, we will not reverse a judgment on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the finding of guilt. *Watson*, 204 S.W.3d at 417.

## ANALYSIS

A person commits the offense of deadly conduct if he recklessly engages in conduct that places another in imminent danger of serious bodily injury. Tex. Penal Code Ann. § 22.05(a). A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id*. § 6.03(c) (West 2003). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id*. Recklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded. *Id*. § 22.05(c).

The following evidence was considered by the jury in making its guilt/innocence determination. The jury first heard Bryant's testimony, some of which we have summarized above. Bryant also described a prior incident between himself and Carter that, one might infer, may have influenced Carter's behavior on the day of the alleged offense. According to Bryant, approximately two weeks prior to the shooting, his son had injured a dog belonging to Carter's daughter. Bryant explained that his son and his son's friend had been driving a pickup truck when they came

4

across the dog in the road, opened the door of the truck, and hit the dog with the door. As a result of this incident, Bryant testified, he was informed that his dogs were no longer welcome on Carter's property.

Bryant next recalled what happened when he encountered Carter on the day of the shooting:

> He just jumped out [of his truck] and he started shooting that rifle. And my black dog was further ahead of me than my brown dog was, and he just—he shot him like four times. And the dog was staying on the road. . . . And that's when he ran toward Mr. Carter's pickup. You know, he was just a wounded animal. . . .
>
> And then Mr. Carter—my other dog was running—still running down the edge of the road there, and he turned and shot at him a couple of times. I wasn't even sure at the time if he hit him or not.
>
> And then that's when Mr. Carter, he turned at me and he pointed the gun. He had it like that (indicating), and he was looking at me and yelling and screaming about, 'Why did you bring those dogs by here? I told you not to bring them.' And he pointed that gun right here at my chest and he was yelling. . . .

Bryant testified that he felt threatened when Carter pointed the gun at him and was concerned that Carter might shoot him. Bryant explained, "He'd just rang off about six or eight rounds and was shaking and yelling and screaming. I thought—yeah, I thought there was a possibility of that happening." On cross-examination, Bryant continued to maintain that Carter had pointed the gun at him. Bryant added that Carter had the rifle "on his shoulder" and "was looking at me" while pointing it at Bryant.

Deputies Kristopher Greenhill and Shawn Wilson of the Caldwell County Sheriff's Office were dispatched to Carter's property to investigate the incident. When the deputies

arrived at the scene, their patrol car video camera recorded their questioning of Bryant and Carter. The recording was admitted into evidence, as was a transcript of the recording. In the recording, Bryant told Greenhill that Carter pointed the rifle "at" him. However, Carter later denied this, saying, "I didn't point the gun at him." Carter also denied aiming the gun in Bryant's direction at any time. In Bryant's written statement to the police taken on the day of the incident, also admitted into evidence, Bryant wrote that Carter aimed his rifle "directly at me." In Carter's written statement to the police, Carter made no mention of whether he pointed the rifle either at Bryant or in Bryant's direction.

Deputy Greenhill testified that Bryant told him that Carter had "pointed the rifle in his direction." Greenhill also opined that a rifle is a deadly weapon and that he believed that Carter had committed a criminal offense against Bryant, specifically aggravated assault with a deadly weapon. Deputy Wilson testified that Carter denied pointing the weapon at Bryant. According to Wilson, Carter stated, "I wasn't pointing it at him. I just raised it up when I was putting it away." Wilson opined that, despite Carter's denial, "it was very evident to us that Mr. Carter had committed a crime," either "animal cruelty" directed at the dogs or "maybe a deadly conduct" or an "aggravated assault with a deadly weapon" directed at Bryant. However, the deputies did not arrest Carter at that time.

Later in the investigation, Carter was interviewed at his residence by Detective David Powell of the Caldwell County Sheriff's Office. The interview was recorded and admitted into evidence. During the interview, Powell elicited the following answers from Carter regarding the incident:

Detective Powell:     Did you ever point your weapon at him?

Mr. Carter:     No.  I pointed it probably—well, I was out of bullets.

Detective Powell:     Right.

Mr. Carter:     And I knew I was, but I positioned it to the right of him—

Detective Powell:     Uh-huh.

Mr. Carter:     —probably towards the end of his [truck] bed or somewhere—

Detective Powell:     Okay.

Mr. Carter:     —and it—kind of in a lowered fashion like this, but I didn't let it completely down like I was out of bullets.

Detective Powell:     Right.

Mr. Carter:     I didn't let him know I was out of bullets.

Detective Powell:     Sure.

Mr. Carter:     And I saw his hands and everything.  I saw he was, you know—you know, okay.  And then I kind of lowered it down. . . .

Detective Powell:     Were you afraid of him coming out with a gun or do you just—

Mr. Carter:     Yeah, initially—

Detective Powell:     —being cautious.

Mr. Carter:     Initially, I would—

Detective Powell:     Okay.  Initially—

Mr. Carter:     —I would.  I just shot his dogs.

Upon completion of his investigation, Powell decided to arrest Carter. In his arrest warrant affidavit, admitted into evidence, Powell stated that he based his decision to arrest on Deputy Greenhill's report, Bryant's statements, and Carter's admission to Powell that he had pointed his rifle in Bryant's direction. Carter was arrested on June 14, 2007, three days after the incident. The patrol-car recording of Carter's arrest was admitted into evidence. During his arrest, Carter again denied pointing the rifle at Bryant.

Witnesses called by the defense included Stacy Christ, chief petty officer with the United States Navy Reserve, who testified that Carter serves in his unit and has received training in the use of firearms. According to Christ, Carter is proficient in the use of firearms. William Avery, Carter's commanding officer, testified similarly. Bryant's neighbor, Barton Galle, testified that he had sent an email to Detective Powell explaining to him that Bryant's dogs "have been aggressive towards me, and everybody that lives around here is safer now that those dogs are gone." Galle's email was admitted into evidence.

Carter's wife, Rosine, also testified. Rosine, who helps her husband operate their business, Carter Cattle and Crude Company, testified that Bryant had a "financial motive" for wanting Carter to go to jail. According to Rosine, there was an ongoing dispute between Bryant and Carter pertaining to Bryant's rights to operate saltwater disposal systems on Carter's land. Rosine claimed that Bryant owed the Carters fees for the use of the land, and, according to Rosine, the amount in dispute was potentially in excess of one million dollars.

We conclude that the above evidence is legally sufficient to support the jury's verdict. Bryant testified that Carter pointed a rifle at his chest—the same rifle that Carter had just used to

8

repeatedly shoot Bryant's two dogs. Bryant also testified that Carter was "shaking," "yelling," and "screaming" during the encounter and that Carter was possibly upset about an incident two weeks earlier involving an injury to one of Carter's dogs that Bryant's son had inflicted. From this and other evidence, the jury could have reasonably inferred that Carter was angry at Bryant and had a motive to point the gun at him. The jury also considered Bryant's oral and written statements to the police that Carter pointed the rifle directly at him. From this evidence, the jury could have found that Bryant's testimony was consistent with his statements to the police. The jury also heard Deputies Greenhill and Wilson opine that they believed Bryant's statements, which could have made the jury more likely to believe Bryant and not Carter. Moreover, although Carter denied pointing the rifle directly at Bryant, he admitted to Detective Powell that he had pointed the rifle in Bryant's direction, which, the jury could have reasonably inferred, placed Bryant in imminent danger of serious bodily injury. Viewing the above evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that Carter recklessly engaged in conduct that placed Bryant in imminent danger of serious bodily injury.

Carter asserts that from his standpoint, his conduct "did not constitute a gross deviation from the standard of care an ordinary person would have exercised at that moment." According to Carter, he was concerned that Bryant himself may have had a weapon during the encounter. However, based on the evidence presented, the jury could have found that this was not an excuse for Carter's conduct. The evidence presented tended to show that Bryant was not armed and did not act aggressive toward Carter during the incident.

Carter also argues that the statutory-presumption instruction caused a "direct contradiction" in the jury's verdict. The statutory presumption provides that "[r]ecklessness and danger are presumed if the actor *knowingly* pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded." Tex. Penal Code Ann. § 22.05(c) (emphasis added). According to Carter, this presumption is inconsistent with the jury's finding that Carter was not guilty of the offense of aggravated assault—an offense that requires an "intentional or knowing" mens rea. *See id*. §§ 22.01(a)(2), .02(a)(2) (West Supp. 2009). However, the jury's findings are not necessarily inconsistent. The jury was instructed that a person commits the offense of aggravated assault if he intentionally or knowingly threatens another with imminent bodily injury. The jury could have found that, although Carter did not intentionally or knowingly *threaten* Bryant, Carter nevertheless knowingly pointed a firearm at him. Moreover, the statutory presumption is not an element of the offense that the State was required to prove. *See Guzman v. State*, 188 S.W.3d 185, 193 (Tex. Crim. App. 2006). Thus, the jury could have found that Carter did not knowingly point the firearm at Bryant but still found that Carter was guilty of the offense of deadly conduct because he *recklessly* pointed the firearm in Bryant's direction. *See* Tex. Penal Code Ann. § 22.05(a) (providing that mens rea for offense of deadly conduct is recklessness).

We similarly conclude that the evidence is factually sufficient to support the jury's verdict. Pointing to Galle's testimony that Bryant's dogs were dangerous, Carter asserts that he was merely "defend[ing] his animals as a rancher has a right to do." However, it would not have been against the great weight and preponderance of the evidence for the jury to find that whatever danger Bryant's dogs presented, this was not a justification for Carter to point his rifle at Bryant,

10

who, the evidence tended to show, posed no threat to Carter or Carter's dog. Carter also argues that there was evidence presented that his rifle was not loaded at the time he aimed it at Bryant. However, it would not have been against the great weight and preponderance of the evidence for the jury to conclude otherwise. It was undisputed that the rifle had been used to shoot Bryant's dogs. Thus, the jury could have found that the rifle was loaded immediately prior to Carter aiming it at Bryant and that it was still loaded when Carter committed the offense against Bryant. The jury, as sole judge of the credibility of the evidence, was free to disbelieve Carter's statement to Detective Powell that the rifle was "out of bullets." Carter also asserts that, because the evidence tended to show that he was trained and proficient in the use of firearms, he would not have acted in a manner that put Bryant in imminent danger of serious bodily injury. However, it would not have been against the great weight and preponderance of the evidence for the jury to conclude that, because of Carter's alleged expertise with firearms, his conduct was *more* likely to place Bryant in imminent danger of serious bodily injury. Finally, it would not have been against the great weight and preponderance of the evidence for the jury to reject Carter's theory at trial that Bryant had a "financial motive" to lie about Carter's behavior. Again, the jury is the sole judge of the credibility of the witnesses. The jury could have found the testimony of Carter's wife regarding Bryant's motive not credible, especially in light of Carter's admissions that he shot Bryant's dogs repeatedly and aimed his rifle "to the right" of Bryant and in the direction of Bryant's truck. Viewing the evidence in a neutral light, we conclude that the jury could have found beyond a reasonable doubt that Carter recklessly engaged in conduct that placed Bryant in imminent danger of serious bodily injury.

11

We overrule Carter's first and second points of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:   April 29, 2010

Do Not Publish